May it please the Court. Good morning, Your Honors. My name is Michael Quaid. I represent the appellant Art Attacks Ink. In this particular matter, my clients who are present, Byron and Joanne Mock, have a company. Their company does airbrushing. And they began in 1993. They acquired some distinctive images that they were airbrushing. And in 1996, they applied for and received a copyright. They were primarily traveling in different parts of the western United States, beginning in fairs and other locations, to sell their merchandise. They would primarily airbrush on T-shirts and the like. They sell about 2,000 a year. Yes, that's correct, Your Honor. So litigation proceeded against MGA beginning in 2004. And in 2007, it went to trial. There's primarily four claims that were advanced, a trademark claim that the jury reached a verdict on, and then three other claims, copyright infringement and trade dress, that the jury did not reach a verdict on. The jury deliberated for approximately a week. And on May 11th, Judge Brewster, the Honorable Judge Brewster, sent the jury back in to try to get them to reach a verdict, and they were unable to do so. And on May 11th, the jury was discharged. Following that, counsel spoke with them. And part of that is referenced in the brief of MGA. The threshold question here is, on a Rule 50 motion, is it jurisdictional? The answer is yes. Well, when was the order entered? The order was entered on Monday, but the jury was discharged on Friday, Your Honor. So the discharging of the jury, if we look at the plain language of the statute, on a Rule 50 motion, it says, if the motion addresses a jury issue not decided by a verdict, no later than 10 days after the jury was discharged, the motion must be filed. It doesn't say no later than the order being entered. And the order being entered triggers two different time periods running. Had we been here today to address the trademark verdict, that date would be applicable, and their motion would have been timely. However, because it was a Rule 50 motion, and if we look at Rule 50 and the case law that surrounds it, the Vincent Court specifically said there's a requirement that post-trial motions be filed within the relevant 10-day period. In that case, it was entry of judgment. It may not be extended by waiver of the parties or by rule of the district court. In the Vincent case, it's 17 Federal 3rd 782. It says the mover's failure to serve the motion within the 10-day period limits or deprives the district court of jurisdiction to alter or reconsider its earlier judgment, citing to Flores, found at 745 Federal 2nd. And the differing viewpoint between my client's respective position and the appellee's is that they're focusing on the entry of the order on Monday the 14th. That's not when the jury was dismissed. All right. Well, we assume that you're correct. Is the Rule 50-B rule a jurisdictional rule as opposed to a mandatory claim processing rule? And haven't you forfeited any objection by failing to raise it at the district court? Thank you for that question, Your Honor. The answer to that would be, number one, it is jurisdictional, and that was cited in the Roddick case found at 1 Federal 3rd 1341. And what happens is when there's rules that are less than 11 days long or narrower, the statute specifically says that the Rule 6-B kicks in, and it says the district court may not extend the time for taking any action under a Rule 50 except to the extent and under the conditions stated in them. And in Rule 50, there is no extension for that. The court went on to say that the 10-day limitation is jurisdictional so that the failure to make a timely motion divests the district court of power to modify the trial verdict, citing to Roddick. And there's additional cases that have come down since then. For example, LAPISAC, L-A-P-I-C-Z-A-K, found at 451 Fed 2nd 79 says, a request for an extension of time to file a motion seeking judgment as a matter of law under Rule 50-B is ineffective even if it's received without objection and granted by the court. So because it's jurisdictional, it can't be waived. And the case that was cited by the appellee, the Weissman case here, 214 Federal 3rd 224, there's a difference between our case and the Weissman case, two issues. Number one, in the Weissman case, there was a post-trial motion. The Rule 50 issue wasn't brought up. In the appeal, the Rule 50 motion wasn't brought up. In our case, the Rule 50 motion was brought up in the appeal. More importantly, though, in Weissman, the reason that the court was able to look at and consider what happened at the trial court level is because a verdict was reached. In this particular case, a verdict was not. And the case is holding beginning as early as Security and Exchange Commission v. Shenry, found at 318 U.S. 80, says, It's familiar appellate procedure that where the correctness of the lower court's decision depends on a determination of fact which only a jury could make, but which has not been made, the appellate court cannot take the place of a jury. So in this particular instance, going back to the timing, the motion was late. We couldn't have waived it because it's jurisdictional, Your Honor. And at the time in their brief, they focus on a conference call that occurred with the Honorable Rudy Brewster on May 14th. And during the conference call, they spoke and they said, quote, We are intending to make a Rule 50 motion that we would like to get filed either this week or the beginning of next week. And we are actually doing it as soon as we can. The case law is clear that that's a prospective act. It's not asking the court to rule now on the motion. And that's distinguishable from Merriweather when Merriweather says, I would like at this time to move for judgment notwithstanding the verdict. And that's found at 879 Federal 2nd 1037. So because they didn't affirmatively move within the 10-day window, one of the issues that I found interesting is yesterday there was a new case came out. I did fax it up to you all. I did also send it to opposing counsel. And I believe it's relevant to our discussion today. It's the Marley case versus USA. And it's found at 06-36003. We have a little form you can fill out for that. I faxed it up last night. That's OK. But we have a form, too. OK. I'll do that, Your Honor. And what happened there is the Ninth Circuit had to decide whether the statute of limitations, the rule that they were grappling with, is jurisdictional, and in turn whether the courts can employ the doctrine of equitable estoppel or equitable tolling. And in that case, the court held because it was jurisdictional, there was no tolling, and there was no equitable estoppel. And I believe that that is very, very similar to what we have here, because it's a jurisdictional rule, and because it is a jurisdictional rule, you have the 10-day period that kicks in. And they were not timely. The reason that that's important is my clients want to be able to get this in front of a jury and have a jury make a final determination on the claims that remain, the copyright, the copyright infringement, and the trade dress issues. Some of the cases that you cited predate Eberhardt versus U.S. and Condrick versus Ryan, in which the Supreme Court in 2004 clarified that procedural rules as mandatory and jurisdictional may be instead simply inflexible claim processing rules, mandatory if invoked by a party, but forfeitable if not invoked, and that was U.S. versus Sadler. What is your response to that? Well, the Sadler court, Your Honor, was focusing on a Rule 4B issue. It wasn't focusing on a Rule 50 issue. So it's a different issue because it was a criminal issue, and I believe the Bowles case versus Russell also focused on, that was also cited by the appellees in their brief, and that dealt with another criminal issue. In this particular case, the 10-day period is not extended in and of itself by looking at the statute. And looking back at Rule 6, it specifically says if you have a time period that's less than 11 days, you count court days, and the 10-day court days would have run out. But we have no Ninth Circuit cases on this particular issue dealing with whether the time restrictions in 6B, 2 and 50B are jurisdictional is really a question of first impression for us, is it not? That's what my research has borne out, Your Honor. That is true. So we have a choice to make here. Yes, you do, Your Honor. And I believe the fundamental fairness of my clients being able to get back in front of a jury, because even if they were successful in that, we then need to jump the hurdle and talk about the access issue. But if it's not jurisdictional, it was forfeited. Isn't that correct? Because it was not raised. Well, I don't believe the case law supports that. I understand what you're saying, Your Honor. Right. As far as the issues are concerned with this copyright claim, we had to prove access and substantial similarity. With regard to access, because of the number of different venues that they showed their merchandise in, including Walmarts, different fairs such as the Del Mar Fair, the L.A. Fair, Orange County Fair, San Bernardino, Riverside, the big fair in Washington, different harvest festivals, going to different sporting events and the like. There is a reasonable possibility that this particular artwork would have been seen. And there's two cases that were cited by the appellees, the Rice case and the Fonda case, talking about we didn't sell enough and therefore we don't qualify. And there's a difference in terms of the types of media that they were focusing on. The Fonda case dealt with books that were sold. And we all know that you can't just look at a cover of a book and come up with what it's about. You've got to spend some time with the plot and the characters and know what's going on. And same thing in the Rice case, which had to do with the videotape. In this instance, these are like walking billboards, billboards on the side of a bus, and it doesn't take a whole lot of time to become familiar with the type of artwork that's there. And when you have this type of artwork being displayed where millions of people have the opportunity to see it by way of going to the fairs and Walmart and the like, I don't believe it. Was there any testimony from anyone who was actually there and saw it and somehow confused? Yes. My client testified at the time of trial that she has people come up to her regularly that says, why should I pay $11, why should I pay $27 for a T-shirt when I can get the same shirt at Target for $11? Most of the evidence, though, appeared to come from personal acquaintances or employees of Aritax and its owner, which this Court has held of liberal probative value. What other evidence can you point to, other people that were connected with the company? Well, the time constraint we had with regard to the time period to put on our case, the 20 hours, Your Honor, limited us in terms of the number of witnesses we could put on. And Judge Brewster is real firm, it doesn't matter who you are and what case you have, it's 20 hours and that's what it is from opening to closing. If you run out of time, you don't have a closing. So we did our best to marshal the evidence and we put on evidence of people. 20 hours is a lot of time. Including opening, closing, cross-examination, sidebars. Yeah. For a trial that went almost three weeks, that's not a whole lot of time. And I know I'm running slow, so I want to make sure I address that point. We did have testimony from one of the witnesses that had traveled from another part of the country. She lived here in this particular, in Southern California. She was, I believe, was in the Marines. And she had bought things, seen things, and moved to another part of the country and testified about her seeing different renditions and how she was familiar with this artwork and confused by it. Yes, one person, yes. You're right, Your Honor. Thank you. I saved my time for rebuttal. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, my name is Craig Holden and I represent Appellee's MGA Entertainment and Isaac Larian. The reason we're before this Court is because a jury last summer hung on three or four intellectual property claims against the manufacturer of the popular Brat Stall. Following that, the Honorable Judge Brewster granted our renewed motion under Rule 50B, finding that no reasonable jury could find, based on the record before it, any basis to sustain the copyright claim based on circumstantial evidence of access, the contributory infringement claim, or the trade dress claim. Starting with the renewed Rule 50B motion, we know that Rule 50B was amended in 2006, and there's not any case law that I've discovered dealing with the particular amendment that indicates that 10 days following the discharge of the jury is the 10 court days, that is, is the deadline to file your renewed judgment as a matter of law. The triggering event I would submit to this Court is the order entered by the Court on May 15th declaring a mistrial. That would be the event that actually discharges the jury. There's obviously a dispute between opposing counsel and I as to whether or not May 11th is the actual date, but the record demonstrates that on May 14th, that's the date that the order is signed, that's the date a status conference is held, and that's the date that the judge declares. Assuming, though, we disagree with you, is that jurisdictional? It's not jurisdictional, and therefore it's waived. Because? Well, I think this is on all four with the Eberhardt case, which, Judge Nelson, you referred to. Like Criminal Rule 33 in that case, the time requirement of Rule 50B is prescribed only by judicial rule. And it does not implement any statutory-based time limitations, as contrasted with the Federal Rule of Appellate Procedure 4A, which implements 21 U.S.C. Section 2107, Subsection C. And so I don't believe it's an issue of first impression. I think it's analogous to the Supreme Court's finding in Eberhardt. Well, the reason I ask that question is I read the trial transcripts. It seemed very clear to me that on that Friday, Judge Brewser thanked the jury, and even though the order was not filed until Monday, I'm speaking only for myself, it appears clear to me that he discharged the jury on May. And told the jurors they could go speak to counsel? I wasn't present, actually, but my understanding is the same as yours, Judge Nelson, that on that Friday, based on a cold read of the record, in all fairness, that the judge did make those statements, but it was on Monday where he actually declared the mistrial. So without getting into the Honorable Judge Brewster's thinking, I'm not sure if he took the weekend to determine whether or not a mistrial would be appropriate, but it certainly appears that on the 11th some activity did occur. What was he going to think about? He already told the jury to go home and they could talk to everybody. Well, the declaration didn't occur until Monday. During the status conference, the record indicates that there is a discussion as to declaring a mistrial, but I absolutely concede that on the 11th there is a clear indication on the record that the jury departs on that date. Mr. Holden, I guess it's the case, if the jury was discharged on Monday, because we exclude Saturdays, Sundays, and holidays, your motion was timely. That's correct, Your Honor. If the jury was discharged on Friday and we should determine that this is not a jurisdictional matter, but a court-imposed rule of mandatory judicial procedure, then there was a waiver of the opportunity to object to the motion, because there was no objection made until your opponent got here to this court. That's exactly right. So it doesn't really make any difference whether it was entered on Friday or Monday. It will be determined by a different legal basis, but the end result would be the same. The answer would be the same.  As to the copyright claim, we know that from, Your Honor, Judge Nelson's Three Boys case, that there are two ways to prove circumstantial evidence of access, one being a chain of events, and we know that from the record there is no chain linking the spoiled brats' works of the appellants to the brats' work. And what we have is a single interrogatory response that questions whether anyone at MGA Entertainment during a ten-year span between 1995 and 2005 ever attended any of a number of fairs, and one person responds and says, on one or more occasions, I may have attended some of these fairs. And so we know that the operative dates are that the product for MGA, the Brat Stall, is launched in June of 2001, so we don't have any supplemental interrogatories that ask, well, did you attend on this one or more occasion, sometime after the product was launched, or was it sometime before? There's no deposition that Art Attack seeks of this person, and they don't call this person to trial. And the only record that's before the court is that this person had no involvement whatsoever in the design of brats. And we know that from Ninth Circuit precedent that proof of access by someone not involved in the creation of the alleged infringing work is not sufficient under the Jason B. Fonda case we cite on page 22. So we don't have a chain of events linking the spoiled brats' work to the brats' property. That leaves them with whether or not they qualify under wide dissemination, the other principle identified in the three boys case. And we know that the test is not whether there's dissemination wide enough for the general public, but whether the dissemination is wide enough in particular as it relates to whether or not there's a reasonable possibility that MGA had access to those works. And we know from the record that neither Mr. Bryant, the creator of brats, nor MGA had ever heard of Art Attacks, had attended any fairs where their booths were displayed, or had even ever seen any of their works during the operative time period until the lawsuit was brought. We also know that they essentially identify three bases for pursuing a wide dissemination theory, one being the booths that they had at these fairs. But we know that the evidence is not a fair depiction of the record. They say that there are tens of millions of people that have seen these booths. Well, there's only 36 million people in California, and I don't believe tens of millions of people are supported by the record. The fairs average about 1 million on average, and we don't have anything other than the testimony of Art Attacks witnesses, including experts in airbrushing who testified that not even they were familiar with some of the works. The Ninth Circuit has rejected as insufficient cases with far more evidence, including the Rice and the Flynn case, as well as Mestre and Jason, which are all cited on pages 29 and 30 of my brief. There's certainly no evidence of access by MGA through the so-called walking billboard theory, that being that people who purchase these T-shirts at the L.A. County or other fairs step out, put on the T-shirt, and walk around and serve as an advertisement, if you will. We only have one person. We actually have the owner of Art Attacks testifying that she's only aware of and could only cite to one person she saw at Carlsbad Beach wearing one of her T-shirts. We don't know whether these are just collector items. We don't have a sufficient record that's laid out before us from their walking billboard theory. That leaves us with their website. And we know that their website was created in 1996 during the infancy of the Internet. The web designer indicated it was slow, that anyone that was looking for it, she was uncertain whether or not it would come up under a search engine. There were no meta tags, which would serve as a basis to increase the website's efficiency and appearance on Internet searches. And even if someone did find the website, we know that you would actually have to scroll deep down on the website to actually see the images. And so what we have is a lot of speculation. And from the Three Boys case, we have a, you know, what is characterized as a bare possibility of access because both MGA and Carter Bryant and Isaac Larian, all of them have testified that they were not aware of the website, had never seen the website, and there's no record to the contrary. So any decision or finding otherwise by a jury, a reasonable jury, certainly could not find otherwise, I would submit. It would have to be based on speculation. And we know that from the few courts that have covered this issue of website-based promotions, including the Hotch and the Nichols case cited on page 34, that they have found that to be inadequate as a basis for wide dissemination. And then that brings us to the Three Boys case, Your Honor's opinion. In that case, I think quite helpfully lays out the law here with respect to the standards of either chain of evidence. I'm sorry, chain linking the two goods or wide dissemination. But the factual finding and the outcome of that case is certainly factually distinct from the record in this case. The singer Michael Colton indicated in that case that he was a huge fan of the songs and the records by the Isley Brothers, that he had all of their stuff, quote-unquote, that he knew everything about them. And as a fan of the Isley Brothers, I can understand that. But we don't have that sort of record here where we have just the opposite, where both MGA, its owner, and the creator, Carter Bryant, all attested the fact that they were unaware of Art Attack's and its spoiled Bratz T-shirt designs. So we have a quite different record from Three Boys. And Three Boys also involves subconscious copying, meaning that Mr. Bolton was accused of subconsciously having copied and even attested to the fact that he was concerned he may have copied something previously. He thought he may have copied Marvin Gaye, but the subconscious copying theory is not really present in this case. The contributory infringement claim involving Mr. Larian fails on its face if there is no underlying infringement. And certainly there's nothing in the record, and they spend little time identifying or attempting to identify anything that would establish the requisite knowledge and intent that's required by that claim. That leaves us with secondary meaning under their trade dress infringement claim. And we know that secondary meaning requires a connection between the buyer's mind and the source of goods, that being Art Attack's and its spoiled Bratz images. And we know that they pursue that evidence not through a survey, even though they conducted one. They chose not to submit that during the trial. Instead, we have testimony, vague testimony from one customer, Ms. Gallagher, who testified that she formed an impression to associate the spoiled Bratz images with Art Attack's. But that testimony is deficient because she doesn't say when she formed that image. We don't know if that was a day before opening statement or if it was 10 years ago. Certainly insufficient and, you know, on its face to establish with just one customer when we have cases such as the Japan Telecom case from this circuit that established where you have seven declarants who attest to familiarity with both the company and its goods was patently insufficient. So we know that certainly less will not carry the day for them. The circumstantial evidence of secondary meeting, they cite to their advertising, but the owner of the company actually says they don't do advertising. Instead, what they do is they spend $2,000 a year on two things, one being business cards and the second being order forms. And the order forms, as to those, are only provided to those people that are actually ordering the goods. That leaves us with their evidence of continued use. And we know that from the Vision Center case that we cite on page 49, that continued use of a particular trade dress or alleged trade dress is not sufficient. The cases indicate that continued use coupled with effective advertising is the criteria. And here there's no evidence that any of the things that they did were effective. In fact, they cite to their website, which I covered earlier, which we know was ineffective according to their web designer, since it was frustratingly slow for those people that would actually visit the website. And then as to actual confusion, as this panel questioned opposing counsel about, three of the four witnesses are employees and friends of the owner of the company, and that's certainly not the perspective of the ordinary consumer and will not carry the day for them. And then, again, the one other person fails to identify in vague testimony when she actually formed her impressions. So I would submit to this Court and respectfully request that it affirm the decision of the Honorable Judge Brewster. Thank you. Thank you. Rebuttal. Thank you, Your Honors. As far as the issue with access, I think the person who spelled it out most clearly was a comment made by Judge Brewster in the request for judicial notice lodged with the Court by opposing counsel on March 25th of 2008. And Judge Brewster said, and there's evidence of information being out there in all kinds of places and seen by all kinds of millions of people who have the opportunity to see that. And so to say that as a matter of law, as you put it, that no reasonable jury could have found that there was reasonable access to the material, you're asking a lot. Now, as far as the standard that we have to satisfy, a reasonable possibility, Donna Rum, who's an employee of the Del Mar Fair, specifically testified that Del Mar gets more than a million people a year. We know that there was testimony that Orange County gets more than a million people a year. L.A. gets more than 1.4 million a year. And there's other fairs that they worked at, in addition to Walmart and the website. And when they're on a major thoroughfare with millions of people having access, Donna Rum stated that 75 percent of the people walk by their booth two times at the fair. That's millions of people having exposure. So when you talk about that over a number of years, you're talking exposure of 4 to 5 million on the low end a year for eight, nine years. That's millions of people. But there was no direct evidence that they looked at them, were confused by them. Nothing of that sort was in the record. The record has what it has in terms of the people who testified. Now, as far as the secondary meeting issue and whether or not there was a survey, the testimony was clear that this small company tried to have a survey but couldn't, and one of the reasons was the big company had private investigators and they were sabotaging the survey. So you can't come into this court and say you don't have a survey, so you'll lose when they went out of their way to purposely sabotage that. And there was evidence of that. And as far as advertising is concerned, the evidence was clear that the mocks spend more than $20,000 a year on booth advertising, and people at the fair are advertising stuff they're not selling like Toyota and the like because it is high exposure. I appreciate your time. Thank you very much. The matter is submitted. Now we'll come to the final matter on our calendar, and that is Taco Bell versus TBWA, Chianti Day Inc.
judges: Pregerson, Nelson, Thompson